IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
RICHARD I. LOHR, II, as      )
Administrator of the Estate  )
of Charles David Fancher,    )
Deceased,                    )
                             )
     Plaintiff,              )
                             )    CIVIL ACTION NO.
     v.                      )      2:12cv533-MHT
                             )          (WO)
JOSEPH EARL ZEHNER, III,     )
et al.,                      )
                             )
     Defendants.             )
```

OPINION

Plaintiff Richard I. Lohr, II, as administrator of the estate of Charles David Fancher, filed this lawsuit against defendant Wilmac Enterprises, LLC, among other defendants. The lawsuit arises out of a series of highway collisions that resulted in Fancher's death. The cause is before the court on Wilmac's motion for summary judgment, which argues that it should not be vicariously liable for

the involvement of co-defendant Ricky Briggs in the collision.[1]

### I. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

---

1. Estate administrator Lohr also pled claims for negligent-and-wanton hiring, entrustment, supervision, retention, training, and maintenance against Wilmac, but in his response to this motion for summary judgment, he abandoned those claims. See Response (Doc. No. 127) at 1.

## II. BACKGROUND

Briggs is an independent owner-operator of a truck. Earlier, he signed a one-year independent-contractor lease agreement with Wilmac. Under the agreement, he leased his tractor to Wilmac and granted the company "exclusive possession, control, and use of the equipment to the extent of complying with the applicable rules of appropriate government agencies" during the term of the lease.[2]  Agreement, Wilmac Ex. 4 (Doc. No. 105-4) at § 3(B).  In exchange, the company would "exercise reasonable efforts to provide freight for hauling by [Briggs] to permit [him] to keep the equipment in regular use," id. at § 5, and compensate him with a portion of any proceeds of his hauls.  The company provided Briggs with identifying placards, which included the Wilmac logo and

---

2. The agreement therefore incorporates 49 C.F.R. § 376.12(c), which provides: "The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease."

'MC Number,' which in turn provided authority to operate in interstate commerce, as required by the Federal Motor Carrier Safety Administration. Wilmac also argues that it terminated this lease agreement on June 30, 2011, and the company provides evidence to that effect. However, there is no evidence that Wilmac notified Briggs of the lease termination or requested return of its identifying placards and MC Number.

In late July 2011, Briggs received a call from Kevin Gibson, the owner of co-defendant Kevin G. Transportation, Inc. Gibson offered Briggs a job carrying a trailer of empty cans to the Coca-Cola plant south of Montgomery, Alabama. Briggs accepted the job and followed Gibson's instructions as to how and where to pick up a trailer and a load. He did not contact Wilmac and, after the job, did not give Wilmac any portion of the funds.

Early in the morning of August 1, 2011, Briggs was finishing the Coca-Cola job for Kevin G. Transportation when he was struck from behind in the first of a series of

collisions leading to Fancher's death. After the accident, he called Gibson but did not contact Wilmac or notify the company of the accident. He testified in deposition that, at the time of the accident, he understood himself to be working for Kevin G. Transportation, but operating under the authority of Wilmac.

## III. DISCUSSION

Wilmac argues that it should not be held liable for Briggs's actions because it had terminated his lease a month prior to the accident. Furthermore, the company argues that, even if the lease were not terminated, liability should not attach because Briggs, by hauling material for Kevin G. Transportation, was acting outside the scope of his employment at the time of the accident. Estate administrator Lohr counters that the company is liable for Briggs's actions under a strict lease-liability theory or, if the court finds that the lease was

5

terminated before the accident, an apparent-authority theory.

The court holds that, even if the lease between Briggs and Wilmac had not been terminated, Wilmac is still not vicariously liable for Briggs's actions because Briggs was operating the vehicle entirely outside the scope of his relationship with Wilmac at the time of the accident.

Lease agreements between truck owners and interstate motor carriers have been subject to extensive, and changing, federal regulation for more than 50 years. In the mid-1950s, Congress discovered that such arrangements were increasingly common in the interstate motor-carrier industry. Instead of owning a fleet of trucks and hiring employees to drive those trucks, motor carriers were contracting with independent owner-operators but exercising significant control over those contractors' equipment and operation. Congress developed legislation in order "to correct abuses that had arisen under often fly-by-night arrangements," arrangements that had led to "a

helter-skelter operation of thousands of unregulated vehicles on the highways as a menace to safety." Simmons v. King, 478 F.2d 857, 866-67 (5th Cir. 1973).[3] The legislation enabled the Interstate Commerce Commission to regulate the leasing of trucking equipment.[4] After extensive proceedings, the commission promulgated regulations governing lease arrangements such as Briggs's. See 49 C.F.R. § 376.12(c) ("The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete

---

3. The Eleventh Circuit has adopted as precedent all decisions of the former Fifth Circuit Court of Appeals rendered prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981)(en banc).

4. "[T]he Commission is authorized to prescribe, with respect to the use by motor carriers ... of motor vehicles not owned by them ... such other regulations as may be reasonably necessary in order to assure that while motor vehicles are being so used the motor carriers ... will be fully responsible for the operation thereof ... as if they were the owners of such vehicles." 49 U.S.C. § 304(e) (1958). The current form of this statute is codified at 49 U.S.C. § 14102(d) and now directs this authorization to the Secretary of Transportation and Federal Motor Carrier Safety Administration.

responsibility for the operation of the equipment for the duration of the lease.").

This exclusive-control regulation, along with corresponding language in lease agreements, has led to significant litigation across federal and state courts concerning the extent of motor carriers' vicarious liability to the public for negligent and wanton acts by the drivers of their leased vehicles. Courts have interpreted the regulations to impose various forms of vicarious liability on motor carriers. At first, some courts imposed so-called 'logo liability' for all negligence involving a vehicle that displayed a carrier's identifying placards and motor-carrier number, regardless of the existence of a lease. See <u>Mellon National Bank & Trust Co. v. Sophie Lines, Inc.</u>, 289 F.2d 473 (3d Cir. 1961) (imposing strict liability after a lease had been terminated because the motor carrier had not yet collected its placards from the driver/lessor) <u>superseded by regulation</u>, Lease & Interchange of Vehicles (Identification

Devices) (49 C.F.R. Part 1057), 3 I.C.C.2d 92, 95-97 (1986) as recognized in Jackson v. O'Shields, 101 F.3d 1083, 1086-87 (5th Cir. 1996).  Other courts imposed vicarious liability that mirrored traditional respondeat-superior principles, covering only those actions that were reasonably within the scope of employment for the motor carrier.  See Wilcox v. Transam. Freight Lines, Inc., 371 F.2d 403, 404 (6th Cir. 1967) ("In our opinion, the I.C.C. regulations do not impose a liability on a carrier using leased equipment greater than that when operating its own equipment.").  Finally, many courts imposed strict-lease liability: so long as there was a lease in effect, "exclusive control" and "complete responsibility" meant that the motor carrier was liable for any negligence involving the vehicle under lease.  See Morris v. JTM Materials, Inc., 78 S.W.3d 28, 38-43 (Tex. Ct. App. 2002).

The former Fifth Circuit Court of Appeals decided one case involving motor-carrier liability for the injury, to a member of the public, resulting from negligence involving

9

a leased vehicle. In Simmons v. King, 478 F.2d 857, the court held that, although there was not an agency relationship between the carrier and the driver under the applicable state law, the federal-lease regulations established such a relationship. 478 F.2d at 865-67. In Simmons, the injury occurred while the truck was carrying a load for the defendant motor carrier. Id. at 863.

Subsequent to Simmons, the Interstate Commerce Commission revised the lease regulations to remove certain obligations that the earlier regulations had placed on motor carriers, particularly with regard to the end of the relationship. In the course of promulgating that regulation, the Interstate Commerce Commission emphasized that the nature of vicarious liability under a regulated lease is a matter of state, not federal, law:

> "We prefer that courts decide suits of this nature by applying the ordinary principles of State tort, contract, and agency law. The Commission did not intend that its leasing regulations would supersede otherwise applicable principles of State tort, contract, and agency law and create carrier liability

10

>
> where none would otherwise exist. Our regulations should have no bearing on this subject. Application of State law will produce appropriate results."

Lease & Interchange of Vehicles, 3 I.C.C.2d 92, 93; see also Petition to Amend Lease and Interchange of Vehicle Regulations, 8 I.C.C.2d 669 (1992) (discussing neutral effect of carrier regulations on classification for state worker's compensation schemes). An agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation." Ramos-Barrientos v. Bland, 661 F.3d 587, 596 (11th Cir. 2011) (quoting Auer v. Robbins, 519 U.S. 452, 461 (1997)) (internal quotation marks omitted). This court cannot find that the commission's interpretation was erroneous or inconsistent. The text of the regulation requires certain language within lease agreements, but it does not impose any liability scheme directly. It is reasonable to interpret the regulation as leaving that question to various States' common-law courts.

11

The court will therefore look to Alabama state law to determine the scope of vicarious liability of a lessee under a federally regulated carrier lease.  The Alabama Supreme Court has addressed this issue several times.  See <u>Vulcan Freight Lines, Inc, v. Buckelew</u>, 386 So.2d 433, 435-37 (Ala. 1980) (and cases cited).  The court has made clear that vicarious liability attaches only if the driver was operating the vehicle "within the line and scope of his employment with the carrier-lessee."  <u>Id</u>.

Admittedly, there is dictum in an Eleventh Circuit Court of Appeals case that suggests that federal law may in fact determine carriers' liability to the public for negligence by a driver of a leased vehicle. <u>Judy v. Tri-State Motor Transit Co.</u>, 844 F.2d 1496, 1501 (11th Cir. 1988).  In that case, the court held that, while federal regulations established a statutory employment relationship between carrier-lessees and drivers of leased vehicles, the legal consequences of that relationship in the context of worker's compensation was

12

a matter of state law. Id. at 1501-02. However, in dictum, the Judy court distinguished such worker's compensation issues from liability to the general public, noting the greater federal interest in regulating that relationship and quoting a new Fifth Circuit opinion that "'the traditional common law doctrine of master-servant relationships and respondeat superior does not apply'" with regard to liability to the public. Id. at 1501 (quoting Price v. Westmoreland, 727 F.2d 494, 497 (5th Cir. 1984)). In light of the Interstate Commerce Commission's statements that federal regulations do not control the scope of liability by carriers and the cursory treatment of this issue in Judy, this dictum does not persuade this district court that federal law should control on this issue.

However, even if federal law were to control, the court would still hold Wilmac liable for Briggs's actions only if they were within the scope of his employment by Wilmac. While Simmons holds that there is a relationship

13

establishing vicarious liability by motor carriers, it does not define clearly the scope of that liability. However, the authorizing statute makes clear that motor carriers should be liable for the operation of leased vehicles "as if the motor vehicles were owned by the motor carrier." 49 U.S.C. § 14102(a)(4).  The former Fifth Circuit addressed the meaning of this provision in White v. Excalibur Ins. Co., 599 F.2d 50 (5th Cir. 1979): "To make them assume the burden of liability for the harm caused by their leased vehicles without according them the protection given employers under state substantive law would broaden their exposure to suit beyond that to which employers in fact are subject. We find no warrant for such strict liability in the federal law."  White, 599 F.2d at 53.  Similarly, if it were applying federal law, this court would accord Wilmac the same protection against liability as an employer would receive; it would not be liable for actions by Briggs outside the scope of his employment.

Having held that liability will attach to Wilmac only if Briggs was acting within the scope of his employment with the company, the court will turn to the facts of the case. There is no dispute that, in this case, Briggs was acting outside the scope of his employment with Wilmac. In fact, he was acting for the benefit of another motor-carrier company, Kevin G. Transportation. There is no evidence that Wilmac condoned or encouraged such side jobs. Therefore, Wilmac cannot be held vicariously liable for Briggs's actions.

***

For the above reasons, summary judgment will be entered in favor of Wilmac and against estate administrator Lohr. An appropriate judgment will be entered.

DONE, this the 3rd day of June, 2014.

    /s/ Myron H. Thompson
    **UNITED STATES DISTRICT JUDGE**